IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MERIT ADVISORS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-cv-00588-G |
| | § | |
| JEFF C. MILLS, NATHAN CAHILL, and | § | |
| BDO USA, LLP, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S FIRST AMENDED VERIFIED COMPLAINT AND APPLICATION FOR INJUNCTIVE RELIEF

Plaintiff Merit Advisors, LLC ("Merit") files this First Amended Verified Complaint and Application for Injunctive Relief against Jeff C. Mills ("Mills"), Nathan Cahill ("Cahill") and BDO USA, LLP ("BDO") (collectively, "Defendants") and would show the Court as follows:

### INTRODUCTION

1.      Merit brings this action against two of its former employees, Mills and Cahill (the "Individual Defendants"), and their new employer, BDO, for their respective roles in an unlawful scheme to misappropriate and use Merit's confidential and proprietary information about its business, clients, and employees to divert Merit's work and goodwill away from Merit and to BDO.

2.      The Individual Defendants' wrongful acts include, among other things, misappropriating and/or using Merit's confidential and proprietary information and trade secrets without authorization for the benefit of themselves and/or BDO, wrongful solicitation of Merit's clients, and ongoing and persistent solicitation of Merit's employees for employment with BDO in violation of their contractual, common law, and statutory obligations to Merit. BDO—a direct

(and much larger) competitor of Merit—is aware of and has encouraged the Individual Defendants' wrongful acts in order to reap the benefits such conduct promised to deliver, including the diversion of Merit's confidential and trade secret information, goodwill, and customer and employee relationships to BDO, and a concomitant increase in market share in Texas and Oklahoma.  Defendants have further demonstrated a clear intention to continue engaging in such wrongful conduct absent immediate intervention by the Court.

3.     As a direct consequence of Defendants' wrongful acts, Merit has suffered significant damages for which Merit has no adequate remedy at law, including without limitation a significant drop in profits (ultimately forcing Merit to discontinue its sales and use tax practice in Oklahoma) and market share; loss of its confidential and trade secret information, clients, and employees; and a severe detrimental impact to its primary assets—its goodwill, client contracts, and employee morale.  Merit therefore seeks redress for the significant and ongoing harm caused by Defendants' wrongful conduct as set forth below.

**PARTIES**

4.     Merit is a limited liability company organized under the laws of the State of Texas, with its principal place of business at 114 W. Main Street, Gainesville, Texas 76240.  Merit has approximately 73 employees and maintains only four offices: two in Texas and two in Oklahoma.

5.     BDO is a Delaware limited liability partnership with its principal place of business at 5300 Patterson Ave. SE, Suite 100, Grand Rapids, Michigan 49512.  BDO has over 8,000 employees and locations throughout Texas and the United States.  BDO's registered agent in Texas is Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, which may be found and served with process at 211 East 7th Street, Suite 620, Austin, Texas 78701.

6.     Mills is an individual citizen and a resident of the State of Oklahoma and has appeared in this action through counsel.

7.     Cahill is an individual citizen and a resident of the State of Oklahoma and may be served with process at 1833 Casey's Ct., Edmond, Oklahoma 73025.

## JURISDICTION AND VENUE

8.     Pursuant to 28 U.S.C. § 1332(a), the Court has subject-matter jurisdiction over this civil action because the action involves citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

9.     Venue is proper in the Dallas Division of the Northern District of Texas because a substantial part of the events or omissions giving rise to the claims occurred in this division and district.  *See* 28 U.S.C. § 1391(B)(2).  In addition, Mills and Merit selected Dallas County as the mandatory venue for any claims arising under or relating to the relevant contract between them.

10.     The Court has personal jurisdiction over Defendants.  Mills contractually consented to jurisdiction over him by courts located in Dallas County, Texas.  BDO is registered to do, and does conduct, business in the State of Texas, and maintains multiple offices in the State of Texas, including an office in Dallas.  All Defendants have regular and systematic contacts with the State of Texas and have purposefully availed themselves of the benefits of doing business in the State of Texas.  And, as the foregoing would suggest, all or a substantial part of the claims against Defendants arise from conduct occurring in or directed by one or more Defendants towards the State of Texas.

## FACTUAL BACKGROUND

**A.     Merit's Business and Confidential Information.**

11.     Merit is a boutique firm that provides business and tax consulting and compliance services to customers in the United States, including clients in Texas.  Merit maintains offices in Texas and Oklahoma and has approximately 73 employees.  A majority of those employees report to three Principals and two Partners, who in turn report to Merit's corporate officers in Gainesville, Texas.

12.     By examining opportunities and liabilities across each of its six practice areas, Merit offers clients long-term, integrated tax solutions designed to help minimize tax exposure, maximize cash recoveries, and capitalize on economic incentives.  The accounting industry is highly competitive, and Merit's ability to offer premium services at competitive rates is essential to its viability and success.  Merit derives more than half of its business from long-term relationships with a small base of 40 well-established clients, and has significant experience in the energy, heavy industry, and construction sectors.  By leveraging its deep industry knowledge and providing clients with a targeted range of specialized services designed to meet their specific needs, Merit competes with its much larger competitors, like BDO, in the states in which it operates.  For example, Merit is a leader in oil and gas property tax work in Texas and Oklahoma and provides its energy clients with a range of specialized services, including mineral appraisal and valuation services, designed to meet their long-term business needs.

13.     Because a key component of Merit's business is providing services to a small base of well-established clients, Merit focuses its business development efforts on attracting new clients with more significant accounts, thus resulting in a more limited number of new clients (ten or less) per year.  The lifeblood of Merit's business is the confidential and proprietary information it

4

compiles to ensure that its employees can continue to meet the particularized needs of its base of long-term, well-established clients.  As a provider of business and tax consulting and compliance services, Merit's principal assets consist of (a) Merit's confidential and proprietary business information, (b) the goodwill embodied in the relationships that its personnel develop and maintain with its clients and employees, (c) its reputation in the marketplace, and (d) the amount, manner, cost, terms, and conditions of the services that it provides.

14.     Merit invests significant time, money, and resources in maintaining its existing client relationships and investigating opportunities to expand those relationships.  To that end, Merit has developed confidential, proprietary information regarding its clients, including the work performed for and services provided to its clients, pricing, and other information regarding its business and overall market.  This information includes, but is not limited to: (a) the identity of Merit's customers and non-public information about its employees; (b) client and personnel contracts; (c) the business, finances, and special needs of Merit and Merit's clients and employees; (d) Merit's policies and procedures; (e) Merit's compensation plans and employee benefits; (f) business information including historical pricing of services, marketing and business plans and strategies, pricing strategies, and business methods; (g) unique software programs and databases developed by Merit; (h) information regarding its employees' performance, skills sets, and compensation; and (i) other trade secrets essential to Merit's business value and goodwill.  This information has been developed and compiled at a significant expense to Merit, and it provides Merit with a competitive advantage with respect to the provision of business and tax consulting and compliance services.

15.     Merit has made reasonable efforts to maintain the secrecy of its confidential and proprietary business information.  Merit limits access to its confidential information to employees

on a need-to-know basis and requires employees who will have access to such information to execute agreements containing confidentiality, non-disclosure, and non-solicitation provisions as a condition of their employment with Merit.  In addition, Merit limits access to its confidential information by placing it on password-protected servers and tracking all activity that occurs on its file drive.

**B.    Merit's Relationship and Agreement with Mills.**

16.     Mills previously owned and operated his own business, JCM Tax Solutions, LLC d/b/a Mills Consulting Group ("Mills Consulting Group"), through which he provided property tax consulting services to clients, including clients in Texas.  In or around October 2016, Merit purchased the business from Mills, Mills' wife (Amanda Mills), and Mills Consulting Group (collectively, the "Sellers") pursuant to an Asset Purchase Agreement dated October 1, 2016 (the "APA").

17.     As part of the transactions contemplated by the APA, Merit paid the Sellers significant monetary consideration to purchase the assets of the Sellers' property tax consulting business, including certain specified client contracts and all goodwill relating to the "Business." The APA defined the "Business" to mean the provision of business and tax consulting and compliance services to the Sellers' clients, as set forth in the specified client contracts, and all of the consideration, rights, duties, and obligations associated therewith.  Exhibit A to the APA contained a list of the contracts assigned to Merit, which specifically included: (a) two letter agreements between Mills Consulting Group and Texas-based Urban Oil & Gas Group ("Urban") dated September 22, 2016 and October 31, 2014, respectively; and (b) a letter agreement between Mills Consulting Group and Texas-based Agri-Empresa, LLC ("Agri-Empresa") dated December

3, 2014.  The Sellers further agreed to substitute Merit as the party to any renewal or extension of any specified contract that was not assignable to Merit.

18.     In addition, Merit conditioned the consummation of the transactions contemplated in the APA upon Mills signing an Employment Agreement.  Accordingly, and as a condition of his employment with Merit, Mills executed an Employment Agreement with Merit, which was effective as of October 1, 2016 (the "Employment Agreement").  The Employment Agreement constitutes a valid and enforceable contract between Mills and Merit.

19.     In Section 1 of the Employment Agreement, Merit agreed to employ Mills as a "Principal" during the "Employment Period."  Section 4 of the Employment Agreement further states that:

> The initial term of this Agreement shall be for the period of two-years beginning on the Effective Date (the "**Initial Term**"), unless Employee is earlier terminated pursuant to Section 7 in which case this Agreement shall terminate on the date of Employee's termination of employment. At the expiration of the Initial Term, this Agreement will automatically continue for so long as Employee is employed by Company, but the continued employment of Employee will be on an at-will basis and may be terminated by Company or Employee at any time and for any reason. The period from the Effective Date through the termination of Employee's employment is referred to as the "**Employment Period**."

20.     In Section 6 of the Employment Agreement, Merit agreed to establish an office in Oklahoma City, Oklahoma, which would be Mills' primary employment location, within 60 days following the Agreement's Effective Date.

21.     In Sections 9 and 10 of the Employment Agreement, Mills agreed that Merit would provide him with access to confidential information related to its business and clients (the "Confidential Information")[1] during the course of his employment, and that he had an obligation

---

[1] Pursuant to Section 9 of the Employment Agreement, Confidential Information does not include "information that (x) is or becomes generally available to the public other than as a result of a

to maintain the confidentiality of such information.  For example, Section 9 of the Employment

Agreement states:

> Employee acknowledges that, in the course of Employee's employment with the Company, Employee will be provided with Confidential Information (as defined below) of the Company and of third parties who are the Company's clients. In consideration of the foregoing, and for other valuable consideration provided hereunder, Employee agrees to comply with this Section 9.
>
> (a)     Employee covenants, both during the Employment Period and thereafter that, except as permitted herein or by the Board, Employee shall not disclose any Confidential Information to any Person and shall not use any Confidential Information except for the benefit of the Company. Employee acknowledges and agrees that there is a reasonable risk that Employee would use and disclose Confidential Information in violation of this Section 9 if Employee were to violate any of the covenants set forth in Section 10 below.
>
> ….
>
> (d)     All information that is disclosed (i) to Employee during the Employment Period that relates to Company's business, and (ii) to Employee prior to the Employment Period under a covenant of confidentiality shall be deemed "Confidential Information." Confidential Information shall not include any information that (x) is or becomes generally available to the public other than as a result of a disclosure or wrongful act of Employee; or (y) becomes available to Employee on a non-confidential basis from a source other than the Company.

Mills also agreed to return to Merit all materials in his possession containing Confidential

Information "[a]t any time upon request of Company."

22.     In Section 10 of the Employment Agreement, Mills likewise acknowledged and

agreed that "[t]he Company shall provide Employee access to the Confidential Information for use

only during the Employment Period, and…that the Company will be entrusting Employee, in

Employee's unique capacity as an executive of the Company, with developing the goodwill of the

Company."

---

disclosure or wrongful act of Employee; or (y) becomes available to Employee on a non-confidential basis from a source other than the Company."

23.     Further, Section 10 of the Employment Agreement contains 24-month post-termination client and employee non-solicitation covenants.  For example, Mills agreed, among other things, that for a period of 24 months following the termination of his employment with Merit, he would not "other than on behalf of the Company, directly…solicit or cause to be solicited from the Company any Person who or which is a customer of the Company."[2]

24.     In addition, Mills agreed, among other things, that for a period of 24 months following the termination of his employment with Merit, he would "not, other than on behalf of the Company, directly employ or solicit for employment any Person who is an…employee or agent of the Company."[3]

25.     Pursuant to Section 20 of the Employment Agreement, Mills' obligations under these provisions survived the termination of his employment relationship with Merit.

26.     Merit and Mills also specifically agreed in Section 10 of the Employment Agreement that these non-solicitation restrictions "are reasonable and do not impose any greater restraint than is necessary to protect the Confidential Information and the legitimate business interests of the Company."

27.     Further, Section 10 of the Employment Agreement states that:

To the extent that any part of this Section 10 may be illegal or unenforceable, if a court of competent jurisdiction will determine that such part, if more limited in scope, would have been enforceable, such part will be deemed to have been so written and the remaining parts will be effective as written and enforceable in all

---

[2] Merit seeks to enforce this covenant only with respect to its customers who were serviced by Mills during his employment with Merit and about whom he received Confidential Information (as defined in the Employment Agreement)—around 45 clients, including Urban and Agri-Empresa.

[3] Merit seeks to enforce this covenant with respect to all of its employees because all of them worked with Mills during his employment with Merit and Mills received Confidential Information about all of them during his employment.

events. The Company and Employee agree to request that such court enforce this Section 10 as if so written.

28.     Finally, Section 12 of the Employment Agreement specifies that it "shall be construed according to the laws of the State of Texas."

29.     Accordingly, Merit purchased the goodwill associated with Urban, Agri-Empresa, and approximately 12 other clients pursuant to the APA, and relied on Mills as its representative to continue to service and build and maintain its goodwill with these clients.

**C.     Mills' Access to and Receipt of Merit's Confidential Information.**

30.     Merit established its Oklahoma City office on or about November 1, 2016.

31.     After Mills signed the Employment Agreement, and in reliance on Mills' contractual commitments, Merit provided Mills with its Confidential Information (as defined in the Employment Agreement) and continued to do so on a regular basis throughout his employment as a Principal.  It also entrusted Mills as one of its Principals to create Confidential Information on its behalf.  As a Principal, which is a key position within Merit's organization, Mills held a position of trust and confidence with Merit.  Mills' responsibilities as a Principal included, among other things, managing Merit's client accounts; developing new business on behalf of Merit; and managing other Merit employees.  Accordingly, by November 10, 2020, Mills had acquired a vast amount of Merit's Confidential Information (as defined in the Employment Agreement)—one of Merit's most valuable assets—including, by way of example and without limitation, the following:

- Access to and information about Merit's client accounts, including the Urban and Agri-Empresa accounts, and other confidential and proprietary information and trade secrets concerning Merit's clients (including without limitation their identities and the services Merit provided to them, their anticipated future business needs, and the pricing charged to them for Merit's services);

10

- Highly-sensitive information concerning Merit's services, pricing, expenses, processes (including without limitation Merit's process for tracking its client accounts), methodologies, business strategies, and plans;

- Financial reports and profit & loss statements;

- Confidential contract and agreement terms;

- Employee lists and other personnel information regarding all of Merit's approximately 73 employees, including without limitation information about their compensation structure, employment benefits, skill sets, experiences, qualifications, capabilities, long-term potential, training, certifications, and work product; and

- Highly-sensitive personnel information regarding the approximately 12 employees that Mills supervised in his role as Principal and Managing Director of Merit's Oklahoma City office, including without limitation their salaries, performance reviews, and employment contracts.

Merit compiles its Confidential Information (as defined in the Employment Agreement) at great expense, and providing its Principals with access to analyze and use its Confidential Information (as defined in the Employment Agreement) comes at a great cost to Merit.

32.    Merit works diligently to build rapport with its clients and establish goodwill. Because Merit derives more than half of its business from long-term relationships with a small base of well-established clients, client goodwill is one of Merit's most important assets.  Merit consistently invests in this goodwill to remain competitive in the industry.

33.    Principals who routinely deal in client relations necessarily create goodwill between themselves and clients on behalf of Merit.  Because of the client relationships and the

strategic information that Mills possessed, Mills was in a position to maintain Merit's client accounts, to build and maintain Merit's goodwill with its clients, and successfully acquire new business on behalf of Merit.

34.     Mills worked out of Merit's office in Oklahoma City, Oklahoma, but frequently drove to Texas to visit Merit's headquarters in Gainesville and meet with Merit's Texas-based clients.  For example, Mills has been servicing two of Merit's Texas-based clients—Urban and Agri-Empresa—since closing the transaction contemplated in the APA.  Merit purchased the goodwill associated with Urban and Agri-Empresa pursuant to the APA and relied on Mills as its representative to continue to service and build and maintain its goodwill with these clients.

35.     Under Section 6 of the Employment Agreement, the 2-year Initial Term of Mills' Employment Agreement expired on October 1, 2018, and Mills continued his employment with Merit on an at-will basis after that date.

**D.     Merit Hires Cahill as a Tax Director and Continues to Grow its Relationship with Urban.**

36.     In 2018, as a condition of recent employment, Merit required certain of its employees in the Oklahoma City office to sign a Non-Disclosure, Non-Compete, and Non-Solicitation Agreement which was governed by Oklahoma law (the "2018 Agreement").  The 2018 Agreement constituted Merit's Confidential Information, and Mills had access to the 2018 Agreement by virtue of his position as a Principal of Merit.  Mills was not asked to sign the 2018 Agreement because Mills had already signed his Employment Agreement in 2016.

37.     In or around June 2018, Merit hired Cahill as a Tax Director in its Oklahoma City office.  As a condition of Cahill's employment with Merit, Cahill executed the 2018 Agreement on or about June 18, 2018.  After Cahill signed the 2018 Agreement, Merit provided Cahill with

certain of its confidential and proprietary information related to his services and the company's clients and employees and continued to do so throughout his employment as a Tax Director.

38.     As a Tax Director for Merit, Cahill was responsible for maintaining Merit's client relationships and pursuing new opportunities on Merit's behalf.  Part of that work involved communicating directly with Merit's clients, reviewing and managing client contract terms, and overseeing the provision of relevant services for Merit's clients.  To that end, Cahill regularly communicated directly with many of Merit's most important clients, including Texas-based Urban, and had regular access to Merit's confidential and proprietary information about them, including without limitation the terms of their contracts with Merit.  This information is extremely valuable to Merit's business and is generally not available to anyone outside of Merit.  Any third party in possession of such information would have a significant—and illegitimate—advantage over Merit when competing for business and market share within the industry.

39.     Because of the confidential and proprietary information that Cahill possessed, Cahill was in a position to successfully acquire and perform sales and use tax consulting work for some of Merit's most important clients, including Urban.

40.     Merit entered into another property tax engagement agreement with Urban effective December 12, 2018.  This agreement automatically renewed on an evergreen basis and thus provided Merit with the ongoing opportunity to earn revenue for its services.

41.     By the end of 2020, Merit was providing a variety of services to Urban in addition to Mills' property tax consulting work, including among other things sales tax consulting work under Cahill and mineral appraisal and valuation services performed by other Merit employees.

**E.      The Involuntary Termination of Mills' Employment with Merit.**

42.      On Monday, May 6, 2019, Mills did not report to work at the Oklahoma City office. Merit subsequently learned that Mills had been arrested the previous day for a DWI in Lewisville, Texas.  On or about May 13, 2019, Merit's management met with Mills to discuss the incident.  In lieu of terminating Mills' employment, Merit's management gave Mills a written warning in the form of an Employee Counseling Form, which instructed him to inform Merit about all updates related to his case, particularly with respect to anything that would impact his ability to drive, and reminded Mills that he was not permitted to drive to or from any company event or property where he had consumed alcohol.  Mills acknowledged without protest by his signature that he received a copy of the written Employee Counseling Form and received the counseling it described.

43.      From late May 2019 until November 2020, Mills continued to drive in both Oklahoma and Texas in connection with his work for Merit.  During that period, Mills never notified Merit of any license suspension or other restrictions that impacted his ability to drive in either state.

44.      In or around October 2020, Merit received complaints from other employees in the Oklahoma City and Gainesville offices that Mills was engaging in inappropriate workplace behavior, including by raising his voice in a very unprofessional manner, calling other employees incompetent, and threatening to find others to do their work.  Merit investigated these complaints, amongst others, and, in the course of its investigation, discovered information that caused it to believe that one of Mills' driver's licenses, issued by the Texas Department of Public Safety, had been previously suspended as a result of his DWI and that Mills had failed to disclose the suspension to the company both in violation of the Employee Counseling Form and applicable company policy.

45.     On November 10, 2020, members of Merit's management team met with Mills at Merit's corporate headquarters in Gainesville, Texas, and notified Mills that Merit was terminating his employment.   Accordingly, Merit involuntarily terminated Mills' employment effective November 10, 2020.

**F.     Mills Immediately Hatches an Unlawful Scheme to Retaliate Against Merit by Soliciting Merit's Customers and Soliciting and Employing Merit's Employees.**

46.     While Mills was driving back to Oklahoma City after the November 10, 2020 termination meeting, he communicated with his contact at Urban to let the contact know that his employment with Merit had ended.  In addition, Mills asked his contact at Urban to give Mills the company's property and tax consulting business.  Mills further revealed that, in response, the client contact at Urban promised that Urban would "give" Mills its property tax consulting work, either as a consultant or if he joined a competitor of Merit.  As a disgruntled former employee, Mills thus continued his unlawful scheme of retaliation against Merit by conspiring from that moment forward to take Urban's property tax consulting business from Merit either for himself as a consultant or for a competitor.

47.     On November 20, 2020, Merit sent a cease-and-desist letter to Mills reminding him of his ongoing common-law and contractual duties to Merit, including his duties not to use or disclose any of Merit's trade secrets or Confidential Information (as defined in the Employment Agreement) or directly solicit property tax consulting services from any established customer of Merit.  Merit further requested that Mills provide sworn assurances that he: (a) had returned any of Merit's Confidential Information in his possession or under his control; (b) had not used or disclosed to any third party any of Merit's trade secrets or Confidential Information since his employment terminated; (c) had not directly solicited property tax consulting services from Urban, Urban's affiliate, or any of Merit's other established customers either for his own benefit or for

the benefit of any third party; and (d) intended to fully honor in the future all of his continuing legal obligations owed to Merit.

48.     On November 25, 2020, Merit's counsel received a response in which Mills claimed, through counsel, that he was not bound by the Employment Agreement because he had signed the 2018 Agreement.  Mills' counsel also stated that Mills "does not *believe* he is in possession of any company property, including confidential information, that belongs to Merit" and "confirms that he has not directly solicited property tax consulting services from Urban Oil and Gas Group, its affiliate, or any of Merit's other established customers."  Based on the information previously provided by Mills regarding Urban, however, Merit believed the latter assertion about Urban was false.  Furthermore, Merit confirmed that it did not have any "Non-Disclosure, Non-Compete, and Non-Solicitation Agreement" that Mills allegedly signed in 2018. Nor did Merit find any communication that indicated that anyone at Merit had asked Mills to sign such an agreement in 2018.

49.     On December 4, 2020, Mills' counsel provided Merit's counsel with an "unexecuted copy" of the 2018 Agreement, which did not contain an effective date, footer, page numbers, signature lines, or any particular employee's name.  Merit then reviewed the 2018 Agreement that it had certain of its employees in the Oklahoma City sign.  Each of those agreements, unlike the agreement that Mills provided, contained a footer at the bottom of the page with the document title, page number, and effective date of that particular agreement, and full, lined signature blocks with the signatories' identifying information.  Thus, upon further review, the "unexecuted copy" of the 2018 Agreement that Mills provided actually appeared to be a redacted version of the 2018 Agreement that another Merit employee had signed in 2018.  Upon information and belief, that employee was Cahill, who, upon further information and belief, is

good friends with Mills.  The 2018 Agreement that Mills provided therefore constituted Merit's Confidential Information (as defined in the Employment Agreement), which Mills should not have retained.  Further, the fact that Mills had such Confidential Information in his possession contradicted his counsel's earlier assertion that Mills "does not *believe* he is in possession of any company property, including confidential information, that belongs to Merit."  It also suggested that Mills had been communicating with other Merit employees, including Cahill in particular, following the termination of his employment.

50.    Consequently, on December 15, 2020, Merit's counsel requested additional confirmations from Mills' counsel related to Mills' return of Merit's property and compliance with his non-solicitation obligations under the Employment Agreement.  On December 28, 2020, Merit received a response in which Mills again claimed that the restrictive covenants in his Employment Agreement were inapplicable because they were superseded by the 2018 Agreement.  Mills' counsel also stated that "Mr. Mills does not have any company property/confidential information" and "recalls executing [the 2018 Agreement] at the same time all the other employees in the office were required to execute."

51.    Merit's counsel sent another letter to Mills' counsel specifically refuting Mills' contention that the 2018 Agreement, which Mills did not sign, somehow superseded the obligations in his Employment Agreement.  Merit also explained that it did not ask Mills to sign the 2018 Agreement because he had already signed his Employment Agreement in 2016.  Finally, Merit relayed that it had conducted an extensive search of its e-mails, computer servers, filing cabinets, and other hard-copy records, and confirmed that there was no indication that Mills ever signed the 2018 Agreement or was asked to do so.

52.     In or around January 2021, Mills began working for BDO, one of Merit's competitors, as a Managing Director.

53.     BDO provides assurance, tax, and financial advisory services to clients across the globe.   According to its website, BDO serves more than 400 publicly-traded domestic and international clients and is a member of BDO International, the world's fifth largest accounting network.[4]  BDO has offices in Texas and Oklahoma.

## G.     Cahill Downloads Merit's Confidential Information, Resigns, and Accepts Employment with BDO.

54.     On January 4, 2021, Cahill gave Merit notice that he was resigning.   Merit immediately pulled a report of Cahill's network activity and discovered that Cahill had accessed Merit's network at 10:20 p.m. the previous evening and downloaded a copy of Merit's December 12, 2018 Client Engagement Letter with Urban (the "Urban Contract") which governs Merit's property tax management services for Urban.   The Urban Contract contains a non-public description of services and pricing information and therefore constitutes Merit's Confidential Information (as defined in the Employment Agreement).

55.     When Merit confronted Cahill about this information during his exit interview, Cahill initially denied downloading the Urban Contract.  Cahill then admitted that he had accessed the Urban Contract and claimed he was "just looking at it because I was curious" or similar words to that effect.  When pressed about why he was "curious" given that he was resigning, Cahill further admitted something to the effect that "Merit will not be keeping Urban as a client" and Cahill wanted to know about the "overall opportunity."

---

[4] *See* https://www.bdo.com/about (last visited Apr. 20, 2021).

56.     Cahill thus admitted that he downloaded the Urban Contract in order use it along with Mills to further solicit Urban's business for BDO's benefit and to Merit's detriment.

57.     Cahill thereafter went to work for BDO in Oklahoma as a "Managing Director – Sales/Use Tax."

58.     On or about January 7, 2021, Merit sent a cease-and-desist letter to Cahill reminding him of his ongoing common-law and contractual obligations to Merit and requesting that he provide certain written assurances, including that he had complied and would continue to comply with his obligations.  Merit also sent a letter to BDO advising BDO of Cahill's ongoing common-law and contractual obligations to Merit.  Cahill never provided the requested written assurances.  Instead, Cahill called another Merit employee and verbally berated him.  And although in-house counsel for Merit spoke with in-house counsel for BDO via telephone, BDO never provided a written response.

## H.     Mills Continues Engaging in Unlawful Conduct, Including Soliciting Merit's Employees on Behalf of BDO and Ultimately Employing One of Them.

59.     Armed with Merit's confidential and proprietary information, including upon information and belief the information that Cahill improperly accessed the evening before resigning from Merit (the Urban Contract), Mills continued to improperly solicit Merit's clients and employees on behalf of BDO in direct violation of his ongoing contractual, common law, and statutory obligations to Merit.

60.     On or about January 18, 2021, Merit learned that another Merit employee, Tyler Weir ("Weir"), had been talking to Mills about employment opportunities at BDO and had received an offer of employment from BDO.  Upon information and belief, Mills solicited Weir and the purpose of the solicitation was to induce Weir to leave Merit and join BDO.

61.     On February 1, 2021, Urban notified Merit that it would be cancelling the Urban Contract in 60 days.  Urban is moving all of its work from Merit to BDO.

62.     On February 3, 2021, Merit filed its Original Petition and Application for Temporary Injunction.  Since that date, two additional Merit customers, including Texas-based Agri-Empresa, have notified Merit that they will be cancelling their contracts with Merit to follow Mills.  Merit acquired its account with Agri-Empresa pursuant to the APA, and Mills provided services to both customers during his employment with Merit.  Upon information and belief, Mills solicited both of these customers in violation of his non-solicitation provision.  Upon further information and belief, Mills has continued to solicit Merit's customers on behalf of his new employer, BDO, some of which have also left Merit and given their business to BDO.

63.     On or about February 13, 2021, Mills posted the following solicitation on his LinkedIn:



Mills' LinkedIn solicitation went to long-term clients and employees of Merit Advisors.

64.    Mills has continued soliciting Merit's employees—attempting to induce them to leave Merit and join BDO—and has used Merit's confidential and proprietary information to do so.  As discussed above, by virtue of his position as a Principal at Merit, Mills had direct access to Merit's confidential and proprietary information, including without limitation information about Merit's employees and their compensation structure, employee benefits, skills, and capabilities.

65.    By way of example, Merit has approximately six who can perform mineral property tax consulting work, which is essential for Merit's clients in the oil and gas industry and thus a key component of Merit's business that gives Merit a competitive advantage. BDO did not have mineral property tax consulting expertise as of March 2021, which Mills would need in order to continue to service Urban's account on behalf of BDO.

66.    On or about March 10, 2021, Mills sent direct LinkedIn solicitation messages to a current Merit employee ("S.B.") with whom Mills had worked during his employment with Merit. Mills knew that S.B. had mineral property tax consulting experience, as she had performed that work for Urban during Mills' employment with Merit.   In his direct messages to S.B., Mills specifically stated that, among other things, "we" are looking for someone "interested in working minerals on the consultant side" and will: (1) "pay around 100k, depending on experience," (2) allow the individual to "work from home," (3) offer "4-5 weeks pto," and (4) provide benefits that are "noticeable [sic] cheaper":



Mills has knowledge of the salary that Merit pays S.B., her telecommuting arrangement, and the cost of S.B.'s benefits, all of which constitute Merit's Confidential Information (as defined in the Employment Agreement).

67.    That same day, Mills sent a text message solicitation to another Merit employee with whom he had worked at Merit stating that "we" need "a Sr. Associate for minerals" and it "pays 100k":



Again, Mills knew this employee had mineral property tax consulting experience and also had knowledge of this employee's salary at Merit, which constitutes Merit's Confidential Information (as defined in the Employment Agreement).

68.     Mills separately posted the following solicitation on his public LinkedIn:



Mills notably did not include any specific salary or benefits information in his public LinkedIn post.

69.     On or about March 11, 2021, after previously soliciting her, Mills sent another direct LinkedIn solicitation message to S.B. stating, in part, that "it can't be anyone from Merit" and "I'm precluded from soliciting Merit folks:"



70.     On or about March 23, 2021, another Merit employee, Ashley Bland ("Bland"),
gave Merit notice that she was resigning.  Bland worked for Merit as a Senior Tax Consultant and
had previously reported to Cahill.  When asked why she was resigning, Bland told Merit that she
was leaving because she had offers for jobs that provided (1) better pay, (2) cheaper benefits,
(3) more generous PTO, and (4) the opportunity to work from home.  Thus, the reasons that Bland
provided for resigning tracked Mills' statements in prior solicitations of her and other Merit
employees.  Bland now works for BDO as a "SALT Manager."  Before resigning, Bland sought to
hide the solicitation when she disingenuously stated that she had several prior competing job offers
to choose from.

71.     As a further direct and proximate result of Mills' continued and persistent conduct in violation of his contractual and other obligations to Merit, and Merit's concomitant loss of talent to provide sales and tax services from that office, Merit has now been forced to discontinue its sales and use tax practice in Oklahoma.

72.     The information set forth above thus shows that the Individual Defendants have violated their contractual, statutory, and common law obligations to Merit by misappropriating Merit's confidential information and trade secrets for the benefit of themselves and/or BDO.

73.     In addition, Mills has violated his Employment Agreement with Merit by soliciting work from Merit's clients, including Urban, conspiring with Cahill to access and use Merit's Confidential Information (as defined in the Employment Agreement) to further solicit work from Urban, and soliciting Merit's employees for potential employment opportunities at BDO, including by using its Confidential Information (as defined in the Employment Agreement), among other violations of his contractual, statutory and, common law duties.  Further, and as the foregoing demonstrates, Mills will not cease engaging in such conduct unless enjoined by the Court.

74.     BDO, recognizing the invaluable information, goodwill, industry knowledge, and market share to be gained from the Individual Defendants' wrongful acts, has willfully and intentionally interfered with Mills' Employment Agreement with Merit by causing Mills to violate and continue violating the restrictive covenants in the course and scope of his employment as Managing Director for BDO.

75.     Consequently, Merit began suffering concrete losses as a result of Defendants' conduct well in advance of Bland's resignation.  From December 2020 to the present, Merit has lost multiple clients and employees to BDO, learned of Mills' continued and persistent solicitation of Merit employees on behalf of BDO using Merit's trade secrets and Confidential Information (as

defined in the Employment Agreement), and been forced to discontinue its sales and use tax practice in Oklahoma entirely.  This amounts to more than $1 million in lost revenue, which Merit has suffered as a result of Defendants' wrongful conduct.

76.     In addition to this significant financial harm, Merit has also suffered, and will continue to suffer, irreparable damage to its goodwill associated with its client and employee relationships.

77.     Accordingly, Merit seeks monetary damages as compensation for its resulting losses and injunctive relief tailored to prevent Defendants from inflicting further irreparable harm to Merit and its business.

## CAUSES OF ACTION

### Count I:
### Breach of Contract – Employment Agreement (Mills)

78.     Merit incorporates by reference all preceding and succeeding paragraphs as if fully set forth herein.

79.     Merit and Mills entered into the Employment Agreement for good and adequate consideration.  All conditions precedent have been performed by Merit or are excused.  The Employment Agreement constitutes a valid and enforceable contract.

80.     In his Employment Agreement, Mills undertook certain obligations including, among other things, refraining from:

- Disclosing any of Merit's Confidential Information (§ 9);

- Using any of Merit's Confidential Information except for the benefit of Merit (§ 9);

- Other than on behalf of Merit, directly soliciting or causing to be solicited from Merit any customer of Merit for a period of 24 months following the termination of his employment (§ 10); and

- Other than on behalf of Merit, directly employing or soliciting for employment any of Merit's employees for a period of 24 months following the termination of his employment (§ 10).

Mills also agreed to deliver to Merit all materials in his possession containing Confidential Information at any time upon Merit's request.

81.     These confidentiality, non-disclosure, and non-solicitation provisions, as contained in Mills' Employment Agreement, are reasonably necessary to protect the legitimate business interests of Merit, namely its Confidential Information and trade secrets, customer and employee relationships, goodwill, and other protectable interests.

82.     Mills materially breached the non-solicitation provisions contained in his Employment Agreement by:

- Disclosing and/or using Merit's Confidential Information, including among other things the Urban Contract and confidential information about Merit's employees, in furtherance of his business after joining BDO;

- Taking the 2018 Agreement with him to BDO after termination of his employment with Merit;

- Soliciting Merit's employees for employment with BDO and then employing at least two of them; and

- Soliciting Merit's clients, including Urban, on behalf of himself and ultimately BDO.

83.     As a direct and proximate result of Mills' breaches of the Employment Agreement, Merit has suffered and will suffer damages for which there is no adequate remedy at law, as an award of damages would be inadequate compensation.  Merit is therefore entitled to seek specific

performance of the Employment Agreement.  Merit performed its obligations under the Employment Agreement by employing Mills as a Principal and providing him with Confidential Information (as defined in the Employment Agreement) and establishing an office for him in Oklahoma City, Oklahoma. Merit therefore requests that the Court specifically enforce the Employment Agreement, including the confidentiality, non-disclosure, and non-solicitation provisions, and require Mills to abide by its terms.

84.    Merit also requests that the Court issue preliminary and permanent injunctions to enjoin Mills from further breaching the terms of his Employment Agreement.

85.    In addition, Merit is entitled to actual and consequential damages.  As a direct and proximate result of Mills' material breaches, Merit has incurred damages including, but not limited to, lost profits and costs incurred.

86.    Merit further is entitled to recover reasonable and necessary attorneys' fees under Texas Civil Practice and Remedies Code Section 38.001(8), as this is a suit on a written contract, and under Section 12(c) of the Employment Agreement.

**Count II:**
**Breach of Fiduciary Duty (Cahill)**

87.    Merit incorporates by reference all preceding and succeeding paragraphs as if fully set forth herein.

88.    Merit entrusted Cahill with its confidential information and goodwill and provided Cahill with the means, opportunity, and resources to maintain and develop client relationships and additional goodwill on Merit's behalf.  Consequently, Cahill held a position of trust and confidence with Merit, and Cahill owes an ongoing informal fiduciary duty of confidentiality to Merit.  This duty requires Cahill to preserve the confidentiality of the confidential and proprietary information

he received or learned during his employment with Merit as a Tax Director, and to refrain from using or disclosing that information for his own benefit or in any manner adverse to Merit.

89.     Cahill has breached his fiduciary duties to Merit by downloading and using and/or disclosing Merit's confidential information—including the Urban Contract—to target, solicit, and divert certain business away from Merit and to BDO.  Cahill remains in a position to continue using and disclosing Merit's confidential information for the benefit of himself and/or Mills and BDO, as Cahill has neither returned the information that he wrongfully downloaded nor provided any assurances that he will not violate his ongoing common-law obligations to Merit.

90.     Cahill's breach of fiduciary duty has resulted in injury to Merit and/or benefit to Cahill, Mills, and BDO.

91.     Merit therefore requests that the Court issue preliminary and permanent injunctions to enjoin Mills from further breaching his ongoing fiduciary duties to Merit.

92.     Further, as a direct and proximate result of Cahill's breach of fiduciary duties, Merit has suffered, and continues to suffer, substantial injury, including a loss of profits from the business opportunities diverted by Cahill for which Merit now seeks to recover actual, compensatory, and consequential monetary damages in an amount to be determined at trial.

93.     In addition, because Cahill breached his fiduciary duties intentionally, willfully, wantonly, maliciously, and without justification or excuse, Merit is also entitled to recover exemplary damages from Cahill in an amount to be determined at trial.

### Count III:
### Breach of Contract – the 2018 Agreement (Cahill)

94.     Merit incorporates by reference all preceding and succeeding paragraphs as if fully set forth herein.

95.     Merit and Cahill entered into the 2018 Agreement for good and adequate consideration.  All conditions precedent have been performed by Merit or are excused.  The 2018 Agreement constitutes a valid and enforceable contact.

96.     In the 2018 Agreement, Cahill agreed that, among other things, he would not: (a) during his employment with Merit, disclose to any person or use any of Merit's confidential information, including pricing materials, except in connection with his job duties or on behalf of Merit; and (b) for the 24-month period after the end of his employment with Merit, disclose to any person or use in subsequent employment any of Merit's confidential information, including pricing materials.

97.     These confidentiality and non-disclosure obligations, as contained in Cahill's 2018 Agreement, are reasonably necessary to protect the legitimate business interests of Merit, namely its confidential and proprietary business information.

98.     Cahill materially breached the confidentiality and non-disclosure provisions contained in the 2018 Agreement by downloading and: (a) using and/or disclosing Merit's confidential information, including the Urban Contract, during his employment with Merit in a manner adverse to Merit; and/or (b) using in subsequent employment and/or disclosing Merit's confidential information, including the Urban Contract, following the termination of his employment with Merit.

99.     As a direct and proximate result of Cahill's breach of the 2018 Agreement, Merit has suffered and will suffer damages for which there is no adequate remedy at law, as an award of damages would be inadequate compensation.  Cahill remains in a position to continue using and disclosing Merit's confidential information for the benefit of himself and/or Mills and BDO, as Cahill has neither returned this information nor provided any assurances that he will comply with

his ongoing contractual obligations to Merit.  Merit therefore requests that the Court issue preliminary and permanent injunctions to require Cahill to return all of Merit's confidential information in his possession, including the Urban Contract, and enjoin Cahill from further breaching any of the confidentiality and non-disclosure provisions in the 2018 Agreement.

100.    In addition, Merit is entitled to actual and consequential damages.  As a direct and proximate result of Cahill's material breaches, Merit has incurred damages including, but not limited to, lost profits and costs incurred.

101.    Merit further is entitled to recover reasonable and necessary attorneys' fees under Texas Civil Practice and Remedies Code Section 38.001(8), as this is a suit on a written contract.

### Count IV:
### Violations of the Texas Uniform Trade Secrets Act (the Individual Defendants)

102.    Merit incorporates by reference all preceding and succeeding paragraphs as if fully set forth herein.

103.    The Individual Defendants' misappropriation of Merit's trade secrets and confidential, proprietary information constitutes a violation of the Texas Uniform Trade Secrets Act ("TUTSA").  TEX. CIV. PRAC. & REM. CODE §§ 134A.001-.008 *et seq.*

104.    Merit is in the business of providing business and tax consulting and compliance services for clients.  Merit owns trade secrets in the form of customer contracts (including without limitation the Urban Contract), the business methods and processes in place for its services, and personnel information about its employees (including without limitation the 2018 Agreement).  As set forth above, Merit made a reasonable effort to keep its trade secrets and confidential information a secret, and the information is generally unknown to and not readily ascertainable through proper means by third parties.  For example, Merit requires its employees with access to such information to sign agreements containing confidentiality, non-disclosure, and non-

solicitation provisions.   Merit also limits which employees have access to its confidential information.

106.     As trusted agents of Merit, the Individual Defendants were under an obligation to maintain the confidentiality of Merit's confidential and proprietary information and owed contractual and common law duties to Merit not to disclose or use such information.

106.     By engaging in the conduct alleged above, the Individual Defendants have misappropriated, retained, and misused Merit's trade secrets and confidential information for the benefit of themselves and a direct competitor (BDO), and to the detriment of Merit, resulting in Merit's loss of a competitive advantage over its competitors in violation of the TUTSA.

107.     Furthermore, the Individual Defendants have used and disclosed, and will inevitably continue to use and disclose, Merit's trade secrets and confidential information because the Individual Defendants are now working for a direct competitor in similar capacities as the positions they held at Merit, and their duties will necessarily cause them to use or disclose Merit's trade secrets and confidential information.

108.     The Individual Defendants' wrongful conduct has directly and proximately caused immediate, irreparable injury to Merit, which requires the relief and remedies available through the TUTSA.   As such, Merit seeks injunctive relief to enjoin the Individual Defendants from using or disclosing any of Merit's trade secrets and confidential information.

109.     In addition, or in the alternative if necessary, the Individual Defendants' actions have resulted in actual and consequential damages to Merit for which Merit is entitled to recovery.

110.     Further, Merit's injury resulted from the Individual Defendants' willful and malicious misappropriation of Merit's trade secrets, which entitles Merit to exemplary damages under Texas Civil Practice & Remedies Code Section 134A.004(b).   The Individual Defendants'

unlawful acts were malicious in that they were done with specific intent to cause substantial injury to Merit and involved an extreme degree of risk to Merit, of which the Individual Defendants were aware and consciously ignored.

111.    Merit is also entitled to recover reasonable and necessary attorneys' fees under Texas Civil Practice and Remedies Code Section 134A.005 because the Individual Defendants willfully and maliciously misappropriated Merit's trade secrets.

**Count V:**
**Civil Conspiracy (the Individual Defendants)**

112.    Merit incorporates by reference all preceding and succeeding paragraphs as if fully set forth herein.

113.    The Individual Defendants conspired to wrongfully acquire and misappropriate Merit's confidential information and trade secrets, including the Urban Contract, to divert business away from and cause financial harm to Merit, gain a competitive advantage over Merit, and benefit themselves and/or BDO.

114.    The Individual Defendants committed unlawful, overt acts in furtherance of the object of the combination.  Specifically, they committed trade secret misappropriation and Cahill breached (and Mills encouraged Cahill's breach of) his fiduciary duties to Merit.

115.    As a direct and proximate result of the combination and its object, Merit has been damaged.  A significant portion of the damages Merit has suffered and continues to suffer from the Individual Defendants engaging in a civil conspiracy are incapable of exact proof

116.    Accordingly, the Individual Defendants are jointly and severally liable for all acts done by either of them in furtherance of the conspiracy.

## Count VI:
## Tortious Interference with an Existing Contract (BDO)

117.    Merit incorporates by reference all preceding and succeeding paragraphs as if fully set forth herein.

118.    The Employment Agreement constitutes a valid and enforceable contract between Merit and Mills.

119.    BDO knows of Mills' Employment Agreement with Merit and Merit's interest in the Employment Agreement.  Specifically, BDO knows of Mills' confidentiality, non-disclosure, and non-solicitation obligations to Merit.

120.    BDO willfully and intentionally interfered with Merit's Employment Agreement with Mills by knowingly causing Mills to violate the restrictive covenants contained in his Employment Agreement in the course and scope of his employment as Managing Director for BDO to enable it, and them, to unfairly compete against Merit.

121.    Merit requests that the Court issue preliminary and permanent injunctions to enjoin BDO from tortiously interfering with the Employment Agreement between Merit and Mills.

122.    In addition, Merit is entitled to actual and consequential damages incurred as a direct and proximate result of BDO's tortious interference with the Employment Agreement between Merit and Mills, including but not limited to lost profits, damage to goodwill, and costs incurred.

123.    Merit's damages resulted from BDO's malice, which entitles Merit to exemplary damages under Texas Civil Practice & Remedies Code Section 41.003(a).

## ALTERNATIVE REFORMATION

124.    In the alternative, should the Court determine that any part of Mills' Employment Agreement with Merit is too broad to be enforced as written, Merit requests that those broad or

unenforceable restrictions be enforced in such lesser part as would be reasonable and enforceable under applicable law, and/or that the overbroad restriction be reformed by the Court to make the restriction enforceable to the fullest extent possible for the protection of Merit's legitimate business interests.

125.    Partial enforcement or reformation consistent with the relief described above has been expressly agreed to and authorized by Mills in Section 10(c) of his Employment Agreement. Merit relied on this contractual representation by Mills in entering into the Employment Agreement.  Accordingly, Mills is barred from taking the position that the Court cannot engage in partial enforcement or reformation.

### APPLICATION FOR PRELIMINARY INJUNCTION

126.    Merit incorporates by reference all preceding and succeeding paragraphs as if fully set forth herein.

127.    Pursuant to Federal Rule of Civil Procedure 65, Merit applies to the Court for a preliminary injunction to prevent the further misappropriation of its trade secrets and confidential information by the Individual Defendants and further breaches of contract by the Individual Defendants for the benefit of themselves and their new employer, BDO.  To that end, Merit will subsequently file a separate Motion for Preliminary Injunction.

128.    A plaintiff seeking a preliminary injunction must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the plaintiff will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that that the injunction might cause the defendants; and (4) that the injunction will not disserve the public interest.  *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).  Merit has satisfied all four requirements.

A.    **Merit is Likely to Succeed on the Merits of its Claims.**

129.    To make this showing, Merit need only present a prima facie case, and need not prove that it is entitled to summary judgment. *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013).

130.    ***First,*** Merit is likely to succeed on the merits of its breach-of-contract and tortious-interference claims against Mills and BDO.   As discussed above, Mills has breached his Employment Agreement with Merit by using and/or disclosing Merit's Confidential Information (as defined in the Employment Agreement) to solicit Merit's clients, including Urban, on behalf of his new employer, BDO, and to solicit Merit's employees for employment with BDO. Moreover, BDO has tortiously interfered with the Employment Agreement between Merit and Mills by—at a minimum—knowingly permitting and encouraging Mills to use Merit's Confidential Information (as defined in the Employment Agreement) to solicit Merit's employees to join BDO in violation of the Employment Agreement.

131.    Mills originally took the position that the Employment Agreement was not enforceable because he signed the 2018 Agreement (which, he claimed, superseded his Employment Agreement).   Mills then claimed that his non-solicitation obligations to Merit were not enforceable because Oklahoma law governed the Employment Agreement.   Mills has now abandoned those positions and instead claims that the non-solicitation restrictions are "facially unenforceable" under Texas law. *See* Pl.'s Mot. to Dismiss, Doc. 7.  Mills is incorrect.

132.    The employee non-solicitation covenant in Mills' Employment Agreement is not "facially unenforceable" merely because it extends to any "Person who is an…employee" of Merit. The sole case Mills cites in support of this proposition involved highly distinguishable facts. *See Ally Financial, Inc. v. Gutierrez*, No. 02-13-00108-CV, 2014 WL 261038, at *8 (Tex. App. — Fort Worth Jan. 23, 2014, no pet.) (concluding that a covenant prohibiting a supervisor in a

company's IT department from soliciting "all" 14,000 employees who worked for the company or any of its subsidiaries across the country for two years was unreasonable). This is not a case in which a large company with thousands of employees and hundreds of locations across the country is seeking to enforce a non-solicit that prohibits a low-level supervisory employee from soliciting any employee of the company or its subsidiaries.

133.    Where, as here, the employee at issue is a high-level executive who worked for a relatively small company with only a few locations and who had received confidential information about all of its employees, courts have upheld as reasonable employee non-solicitation restrictions that extend to all employees of an employer. *See, e.g., Smith v. Nerium Int'l, LLC*, No. 05-18-00617-CV, 2019 WL 3543583, at *6-8 (Tex. App. — Dallas Aug. 5, 2019, no pet.) (distinguishing *Gutierrez*, upholding a grant of a temporary injunction against a former employee, and finding the non-solicit which prohibited solicitation or recruitment of "any" worker of the company to join a competitor to be reasonable and enforceable); *Hernandez v. Combined Insurance Company of America*, No. 02-20-00225-CV, 2021 WL 520456, at *8-12 (Tex. App.—Fort Worth Feb. 11, 2021, no pet. h.) (rejecting *Gutierrez* "for reasons similar to those cited by *Smith*" and finding a company met "the threshold of raising a bona fide issue that the . . . covenant was reasonable" where it prohibited an employee who had access to confidential information for all of the agents in Texas from soliciting "any" employees working in the state). Federal courts applying Texas law have likewise upheld as reasonable employee non-solicit covenants that extended to all employees of an employer. *See, e.g., Everett Fin., Inc. v. Primary Residential Mortg., Inc*., No. 3:14-CV-1028-D, 2016 WL 7378937, at *8 (N.D. Tex. Dec. 20, 2016); *Merritt Hawkins & Assocs., LLC v. Gresham*, 79 F. Supp. 3d 625, 639–40 (N.D. Tex. 2015) (same), *aff'd*, 861 F.3d 143 (5th Cir. 2017).

134.    Mills also incorrectly claims that the customer non-solicitation covenant in Mills' Employment Agreement is "fatally overbroad" because it extends to "any" customer of Merit and contains no "reasonable geographic or time restrictions."  Again, Mills is incorrect here given the circumstances set forth above.  The covenant *does* contain time restrictions, as Mills specifically agreed that both during and for a 24-month period following the termination of his employment with Merit, he would not, other than on behalf of Merit, directly solicit or cause to be solicited from Merit "any Person who or which is a customer of Merit."

135.    Further, the customer non-solicit covenant is narrowly tailored to protect the client contracts and goodwill that Merit purchased from Mills pursuant to the APA and Merit's business interests in keeping Mills from targeting its clients.  The restriction, as drafted, merely prohibits Mills during the relevant time period from directly soliciting or causing to be solicited from Merit any current clients of Merit.  It does not prevent, nor does Merit seek to prevent, Mills from working for BDO.  Mills is also free to solicit anyone following the 24-month period in the covenant so long as he is not violating the other terms of his Employment Agreement.  The restriction thus is not "facially overbroad" as Mills claims.  *See, e.g., Le-Vel Brands, LLC v. Bland*, No. 3:19-CV-00154-L, 2019 WL 4753041, at *7 (N.D. Tex. Sept. 30, 2019) (Lindsay, J.) (upholding as reasonable the portion of a non-solicitation covenant restricting the defendant from soliciting the plaintiff's promoters, employees, and current customers, but excluding as unreasonable the portion prohibiting solicitation of *potential* customers).

136.    In any event, given the particular facts and circumstances of this case as set forth above, Merit has raised sufficient allegations at this preliminary stage to survive Mills' motion to dismiss.  *See, e.g., Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 657 (Tex. 2006) (rejecting argument that client non-solicit that prohibited solicitation of "any" prospective client

or affiliation member was overbroad because it was unrelated to confidential information the employee received during his employment where the employee held a director-level position for the company, helped the company for four years to continue to develop its client relationships, his covenant precluded him from calling on only a limited number of clients, and he could unfairly "capitalize on" this experience and the confidential business information he received after going to work for a competitor with respect to these clients); *Hernandez*, 2021 WL 520456, at \*12 (finding that "at this preliminary stage of the proceedings," the employee's access to confidential information about a company's customers "meets the threshold of raising a bona fide issue" regarding whether the company may be able to enforce customer non-solicit covenant prohibiting solicitation from "any of the Company's policyholders").

137.   ***Second***, Merit is likely to succeed on the merits of its other claims against the Individual Defendants.  As set forth above, Cahill has breached his fiduciary and contractual duties to Merit by taking, using, and disclosing its confidential and proprietary information for the benefit of himself and/or Mills and BDO and to the detriment of Merit.  Cahill did so with Mills' encouragement as part of the Individual Defendants' unlawful scheme to divert business away from and cause financial harm to Merit, gain a competitive advantage over Merit, and benefit themselves and/or BDO.

138.   The Individual Defendants have also misappropriated Merit's trade secrets and confidential, proprietary information in violation of the TUTSA.  The Individual Defendants' statuses as high-level executives of Merit gave rise to an independent duty to maintain confidentiality and to use Merit's confidential and trade secret information only for proper purposes.  Despite these obligations, Cahill improperly downloaded the Urban Contract for the benefit of himself and Mills to allow Mills and BDO to unfairly compete against Merit.  The

Individual Defendants have used and/or disclosed this information without authorization to solicit Merit's client, Urban, for the benefit of themselves and their new employer, BDO.

139.     Moreover, the Individual Defendants have used and/or disclosed Merit's other trade secrets, including without limitation confidential information about Merit's business methods, pricing, processes, services, and employees (including information about their compensation, benefits, skills sets, and contracts with Merit) without authorization to solicit Merit's employees for employment with their new employer, BDO, and to further solicit Merit's clients for the benefit of themselves and/or BDO.

140.     The materials and information that the Individual Defendants have misappropriated constitute Merit's trade secrets, as they contain or constitute confidential pricing, business, and personnel information that is not generally known and that gives Merit a competitive advantage in providing business tax consulting and compliance services to customers.  This information was kept strictly confidential and disclosed only to authorized employees as needed to perform their job functions.  Merit's policies and contracts with its employees also protect this information.

141.     Further use and disclosure of Merit's trade secrets by the Individual Defendants is also inevitable given the similar (and competing) nature of BDO's business.  *See AHS Staffing, LLC v. Quest Staffing Grp., Inc.*, 335 F. Supp. 3d 856, 861, 869 (E.D. Tex. 2018) (holding that a staffing company made a prima facie case for injunctive relief for the threatened misappropriation of its trade secret—a tracking system containing information about candidates' contract statuses, skills, work history, availability, and compensation structures—under the TUTSA).  Accordingly Merit is likely to succeed on the merits of all of its claims against Defendants.

**B.      Merit Will Suffer Irreparable Harm Unless the Court Grants a Preliminary Injunction.**

142.      To satisfy this requirement, Merit must show that it is "'likely to suffer irreparable harm,' that is, harm for which there is no adequate remedy at law." *Daniels Health Scis.*, 710 F.3d at 585 (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

143.      Mills' wrongful conduct, including soliciting work from Merit's clients on behalf of BDO, conspiring with Cahill to misappropriate Merit's Confidential Information (as defined in the Employment Agreement) and trade secrets to further solicit work from Urban, and using Merit's confidential and trade secret information to solicit for employment and employ Merit's employees, among other breaches of his Employment Agreement, has caused and will continue to cause Merit irreparable injury for which it has no adequate remedy at law.

144.      As discussed above, Merit has suffered, and without the benefit of immediate injunctive relief will continue to suffer, irreparable harm as a result of Defendants' conduct—namely, the loss of its confidential and proprietary information and trade secrets, goodwill, clients, contracts, and employees. *See, e.g., Expo Grp., Inc. v. Castillo*, No. 3:19-CV-1356-G, 2019 WL 4671511, at *7 (N.D. Tex. Sept. 25, 2019) ("In Texas, injury resulting from the breach of non-compete covenants is the epitome of irreparable injury") (citation omitted); *Tranter, Inc. v. Liss*, No. 02-13-00167-CV, 2014 WL 1257278, at *7 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.) ("A highly trained employee's continued breach of a noncompete agreement creates a rebuttable presumption that the employer is suffering an irreparable injury").

145.      Mills has already indicated that he cannot pay money damages.   Thus, if an injunction does not issue, there is no legally enforceable assurance that Mills will not continue to solicit Merit's clients and employees on behalf of himself and BDO using Merit's trade secrets and Confidential Information (as defined in the Employment Agreement).

146.    Although Mills claims that Merit cannot establish irreparable injury based on Merit's delay in seeking a preliminary injunction, *see* (Doc. 7 at 13-14), this contention is without merit.  As set forth above, Merit received notice that Urban was canceling its contract with Merit on February 1, 2021, and filed its Original Petition and Application for Temporary Injunction on February 3, 2021.  Mills removed the action to this Court on March 15, 2021, *see* (Doc. 1), and subsequently requested an extension of time to April 1, 2021 to respond to the Petition, *see* (Doc. 4).  As Mills noted in his extension request, the parties were at that time engaged in discussions of potential early resolution of these disputes, *see* (Doc. 4, ¶¶ 2).  Based on those discussions, and in an effort to conserve resources, Merit did not at that time further pursue a temporary restraining order or preliminary injunction.

147.    Mills continued to breach his employee non-solicitation obligations to Merit while the parties were engaged in such discussions, and as a result of Mills' improper solicitations Merit lost yet another employee to BDO (Bland).  When Merit asked Bland why she was resigning, Bland parroted the same language that Mills had used in his Linkedin and text message solicitations to other Merit employees one month earlier: better pay, cheaper benefits, more generous PTO, and the opportunity to work from home.  Bland has since joined Mills and Cahill at BDO as a direct result of Mills's solicitations, thus demonstrating that Mills has continued disregarding any legal obligations that he owes to Merit under his Employment Agreement.

148.    It also apparently has made no difference to BDO that Mills is subject to non-solicit restrictions that prohibit him from engaging in such competitive activity.  BDO hired Bland knowing that such hiring violated the non-solicit in the Employment Agreement.  Consequently, absent a court order requiring BDO to honor Mills' contractual, statutory, and common law

obligations to Merit, BDO is likely to continue to encourage and induce Mills to violate his Employment Agreement.

149.    Furthermore, as set forth above, both Mills and Cahill are working for BDO, a direct competitor of Merit, in substantially similar positions with the same general job duties that they held during their employment with Merit.  The Individual Defendants' misappropriation of Merit's trade secrets and confidential information, Cahill's breaches of his fiduciary and contractual duties, and Mills' breaches of contract have harmed Merit, and will continue to do so until such actions are enjoined.  Merit's client contracts, information regarding its business methods and processes, and personnel contracts and information give Merit a competitive advantage that is destroyed upon disclosure of said information.  Merit thus does not have an adequate remedy at law if the injunctive relief requested herein is not granted.  That is especially true given that Defendants' wrongful conduct has already compromised, and will continue to compromise, Merit's confidential and trade secret information, and has severely impaired Merit's business relationships and goodwill with its clients and employees.  Defendants thus cannot overcome the rebuttable presumption that Merit is suffering irreparable harm.

**C.    The Balance of Hardships Weights Strongly in Favor of Merit.**

150.    As described above, the harm that Merit faces if the Court denies injunctive relief is far greater than the impact upon Defendants of the implementation of injunctive relief, which would merely enjoin the Individual Defendants from breaching their ongoing obligations to Merit. For example, if the Court issues a preliminary injunction, Mills will be allowed to continue working for BDO so long as he does not violate the confidentiality, non-disclosure, and non-solicitation restrictions in his Employment Agreement or his other statutory and common-law obligations to Merit.  As set forth above, Merit is a small boutique firm with approximately 73

employees and offices in two states that specializes in providing services to a small base of well-established clients. BDO, by contrast, has thousands of employees in locations across the country and provides services to a significantly larger client base. Accordingly, Mills will not be restrained from working for BDO. Rather, Mills would be prohibited from using or disclosing Merit's Confidential Information (as defined in the Employment Agreement) and, during the 24-month period following the termination of his employment with Merit: (a) directly employing or soliciting for employment any current employee of Merit; and (b) directly soliciting or causing to be solicited from Merit any customer of Merit. Cahill likewise will be allowed to continue working for BDO so long as he adheres to his ongoing contractual, common law, and statutory obligations to Merit.

**D.    A Preliminary Injunction Will Serve the Public Interest.**

151.    A preliminary injunction will serve the public's interest in knowing that courts will enforce contracts and refuse to permit solicitation of an employer's customers and employees in violation of such contracts. *See, e.g., Le-Vel Brands*, 2019 WL 4753041, at *10 (determining that "the public has an interest in knowing and understanding that agreements between parties will be honored, that contracts will be enforced, and that solicitation of an employer's customers and employees in violation of these kinds of contracts will not be permitted"); *Expo Grp., Inc.*, 2019 WL 4671511, at *8 (reasoning that "enforcing non-competition agreements falls within Texas's fundamental policy"). Moreover, a preliminary injunction will serve the public's interest by depriving Defendants of the benefits of Merit's misappropriated confidential and trade secret information. *See, e.g., AHS Staffing*, 335 F. Supp. 3d at 874 (finding that a preliminary injunction "serves the public interest by depriving Defendants of the benefit of the allegedly misappropriated

trade secret and, in so doing, enforces better business ethics by depriving the alleged wrongdoers of the benefit of their wrongdoing.").

## REQUEST FOR PERMANENT INJUNCTION

152.    Merit incorporates by reference all preceding and succeeding paragraphs as if fully set forth herein.

153.    Based on the foregoing, Merit requests that after a hearing, the Court issue a preliminary injunction against Defendants, set its application for permanent injunction for a full trial on the issues in the application, and, after the trial, issue a permanent injunction against Defendants.

## PRAYER

Based on the above, Merit prays for the following relief:

154.    That upon hearing, the Court issue a preliminary injunction enjoining Defendants from continuing their unlawful acts as set forth above;

155.    That Merit have judgment after final trial against Defendants as follows:

a.    A preliminary injunction to enjoin Defendants from continuing their unlawful acts as described above,

b.    For an order of full specific performance by Mills of the confidentiality, non-disclosure, and non-solicitation provisions in his Employment Agreement;

c.    For actual and consequential damages;

d.    For exemplary damages;

e.    For pre-judgment and post-judgment interest at the maximum lawful rate and from the earliest date permitted by applicable law;

f.    For reasonable and necessary attorneys' fees, including contingent attorneys' fees in the event of an appeal;

g.    For costs of court; and

h.    Such other and further relief, both general and special, at law or in equity, to which Merit may be justly entitled.

Dated:  April 22, 2021

45

Respectfully submitted,

/s/Anthony J. Campiti
Anthony J. Campiti
  State Bar No. 00798092
Lauren B. Timmons
  State Bar No. 24093265

THOMPSON & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas  75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751
E-mail: tony.campiti@tklaw.com
E-mail: lauren.timmons@tklaw.com

ATTORNEYS FOR PLAINTIFF

46

## **VERIFICATION**

THE STATE OF TEXAS          §
                            §
COUNTY OF DALLAS            §

On this day Adam Sijansky appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, he stated that he is the "EVP Operations" for the Plaintiff, that he has read the foregoing Plaintiff's First Amended Complaint and Application for Injunctive Relief; and that the factual allegations in Plaintiff's First Amended Complaint and Application for Injunctive Relief are true and correct.

_____
ADAM SIJANSKY

SWORN TO AND SUBSCRIBED BEFORE ME on the 22th day of April, 2021.

LESLIE CHEANEY
Notary ID #7332815
My Commission Expires
November 12, 2021

_____
Notary Public, State of Texas

528007.000003 25381393.4

47